---

## Case No. 17,297.

### The WAVE.

[Blatchf. & H. 235; [1] 7 N. Y. Leg. Obs. 97.]

District Court, S. D. New York. April, 1831.[2]

COURTS OF ADMIRALTY—JURISDICTION—TIDE WATERS WITHIN STATE—SALVAGE BY PILOT.

1. Courts of admiralty in the United States have jurisdiction over claims for salvage upon waters within the ebb and flow of the tide, though within the body of a state.
[Cited in A Raft of Spars, Case No. 11,529.]

2. A pilot is under no legal obligation to take charge of a vessel in distress. unless her condition be such as to require pilotage services.

3. Courts of admiralty have jurisdiction of suits for pilotage.

4. If a pilot goes beyond the duty imposed upon him by law, · and renders meritorious services to a vessel in distress, he becomes a salvor, and may sue in admiralty for salvage, though the service be performed upon pilotage ground.
[Cited in Flanders v. Tripp, Case No. 4,854; The James P. Donaldson, 19 Fed. 272.]

In admiralty. This was a libel for salvage, filed by the owners and crew of the pilot-boat Gazette, against the schooner Wave. The facts were these: The Wave left her moorings at the wharf in New-York on the 2d of February, 1831, with intent to go to sea. A pilot, (one of the libellants,) had been on board of her after she was ready for sea; but, as she was locked in by ice, and there appeared to be no chance of her getting out soon, he left her. with an understanding that he would return when he was wanted. A signal was afterwards hoisted by the Wave for a pilot. but, a sudden opening of the ice around her occurring. she put out without waiting for a pilot, keeping the signal up. The signal was soon hauled down, the master thinking his mate a competent pilot in the harbor. Near Bedlow's Island, a pilot-boat was spoken coming up. and an inquiry was made, from on board the Wave, about the ice below. No pilot was asked for. In the lower bay. the Wave was found to have sprung a leak, and to be making water rapidly. The master ordered a signal for a pilot to be made. Immediately afterwards it was run down, and a signal of distress was hoisted. Guns were also fired. The schooner was then brought to anchor in three and a half fathoms of water, about a mile from Sandy Hook beach. She was fast filling. The

---

[1] [Reported by Samuel Blatchford. Esq., and Francis Howland. Esq.]
[2] [Reversed in Case No. 17,300.]

crew were exhausted by their exertions, two of them were spitting blood, and, in despair of being able to keep the schooner afloat much longer, they had brought their baggage on deck, and loosened the boat, with a view of making their escape. The pilot-boat of the libellants, when the signal of distress was first observed, was outside the Hook, from three to five miles from the Wave. She immediately made efforts to reach the Wave, but, the tide being ebb, and the wind being strong ahead, she could not reach her under about an hour and a half. When within hail, the inquiry was made from the pilot-boat, as to what was wanted. The master of the Wave said, that his vessel was sinking, and he wanted assistance. Hyer, one of the libellants, boarded her, and, ascertaining her situation, sent back his small boat for more men, and soon after ordered the pilot-boat to be brought alongside of her. Hyer was a branch pilot. He had on board the Gazette, with him, two deputy pilots, three apprentices and a cook. When he went on board the schooner, the master surrendered possession of her to him. The testimony as to the expressions used was not clear or entirely consistent. Some of the witnesses understood that the schooner was delivered up to him absolutely, and others that she was surrendered to him as pilot.

[We can probably arrive at a more satisfactory understanding of what was contemplated at the time by adverting to what was actually done on both sides than by weighing the recollection of different witnesses against each other, for the purpose of fixing upon the exact language used between the parties. Besides, a mere repetition of the words spoken by no means invariably communicates the acceptation of those using or hearing them at the time; and we should repose still less confidence in an attempt to state the precise expressions used at a moment of great agitation and excitement.] [3]

The facts, however, were, that Hyer immediately assumed the entire command on board the schooner. He ordered her hatches to be broken open, shifted the cargo aft to raise her bows, placed a strong relief at the pumps, sent hands forward in a small boat to check the leak by securing a tarpaulin and a board over it, unloaded part of the cargo of the Wave, and loaded the pilot-boat with it, and, when the schooner was so far lightened and freed from water as to be navigable, towed the Wave, by the Gazette to Prince's Bay, where she was anchored and repaired. She was afterwards taken to New-York by his orders exclusively, and it appeared that in taking her to Prince's Bay, and during the time she was anchored there, and in bringing her afterwards to New-York, her master did not ex-

ercise any authority or claim any command. After the Wave was taken to New-York, upon a refusal by her owners to make such compensation for their services as the libellants demanded, they brought the present action. The other facts necessary to the understanding of the case are contained in the opinion of the court.

Aaron Burr, for libellants.
Robert Sedgwick, for claimant.

BETTS, District Judge. The first objection to the recovery of the libellants rests upon the proposition, that the courts of admiralty of the United States cannot take jurisdiction over civil causes of a maritime character arising within the territorial limits of a state. It will be unimportant, in considering this proposition, to inquire whether the cause of action in this case arose within the limits of this state, or those of New-Jersey; for, if the objection is valid, it excludes the jurisdiction of this court in either event. Assuming that the services rendered by the libellants would, if rendered on the high seas, have entitled them to salvage, the point is narrowed to the single inquiry, whether the jurisdiction of the court over a subject matter properly belonging to it, is destroyed because the cause of action arose upon waters within the boundaries of a state. The question is one of great magnitude; for, if the doctrine of the claimant's counsel is correct, courts of admiralty have no jurisdiction within the bays, harbors and inlets with which our vast range of coast is indented, other than what is expressly given by statute in revenue and criminal cases, and all civil causes of a maritime character, which have their origin in those places, fall exclusively under the jurisdiction of the states within whose territorial limits those waters flow.

The argument is founded upon general principles alone. No decision of any state court, claiming such jurisdiction, is referred to, nor am I aware of any decision of any court in this country which supports the doctrine. There is, unquestionably, a great contrariety of opinion in our courts regarding the character and extent of the admiralty jurisdiction. But that difference has respect to the subject matter over which the jurisdiction may be exercised, rather than to the place where the question arises, and will, therefore, be more appropriately considered hereafter.

Although, generally, the question of the jurisdiction of courts of admiralty is determined by the subject matter of the controversy (Menetone v. Gibbons, 3 Term R. 267), yet, in many instances, the locus in quo is a most material particular (The General Smith, 4 Wheat. [17 U. S.] 438). As, if an act be performed on the high seas, the place may, of itself, confer jurisdiction. But it is contended, upon the doctrines of the courts of common law in England, that the admiralty jurisdiction is limited to matters occurring upon the high seas. Without tracing minutely the rise and extent of that doctrine

---

[3] [From 7 N. Y. Leg. Obs. 97.]

in England, it is sufficient, on this branch of the case, to observe, that it has always been a contested point between the court of admiralty and the courts of law (Zouch, 1–51, 122; 1 Sir Leo. Jenkins, 76; 6 Hall, Law J. 56S; The Appollo, 1 Hagg. Adm. 306; 312; 4 Inst. 134; Prynne's Animad. 75 et seq.); and that, in the end, the common law judges have conceded that admiralty may have a concurrent jurisdiction as to place, in bays, harbors, &c., within the ebb and flow of the tide, where ships of war float (Bruce's Case, 2 Leach, 1093). Besides, whether the rule has limits or not in England, our courts regard the decisions of the English common law courts in respect to the jurisdiction of the admiralty as of little or no authority. De Lovio v. Boit [Case No. 3.776]; The Jerusalem [Id. 7,294]. And this particular point appears to be put at rest by decisions of the highest character and authority in this country, which recognise a like jurisdiction of the admiralty in bays, harbors, &c., where the tide ebbs and flows, and on the high seas. The high court of appeals in Pennsylvania, previous to the adoption of the constitution, recognised the admiralty jurisdiction as embracing the waters of the Delaware opposite the city of Philadelphia. Montgomery v. Henry, 1 Dall. [1 U. S.] 49. Judge Bee took cognizance of a salvage case in Charleston Harbor, respecting goods cast on shore, notwithstanding there was a state law in force in regard to wrecks, which applied to the case. Stevens v. Bales of Cotton [Case No. 13,366]. The supreme court sustained a libel for salvage on the Delaware Bay near the town of Lewes. Peisch v. Ware, 4 Cranch [8 U. S.] 347. [So, at a later date, salvage has been allowed for services on board a vessel at anchor in Hampton Roads. Le Tigre [Case No. 8,281].[4] The admiralty takes jurisdiction, also, of claims for seamen's wages, when a part of the service is on tide waters. The Thomas Jefferson, 10 Wheat. [23 U. S.] 42S. In all cases of tort and revenue falling within the cognizance of admiralty, tide waters have been considered, equally with the high seas, as places where that jurisdiction could be exercised. It was decided by the supreme court, soon after its organization, that violations of the revenue laws in the waters of our bays, harbors, &c., were, in their nature, cases of admiralty jurisdiction. La Vengeance, 3 Dall. [3 U. S.] 297. That court has been invoked, on various occasions, to review that decision, but it has always been sustained to the fullest extent. U. S. v. The Sally, 2 Cranch [6 U. S.] 406; U. S. v. The Betsey, 4 Cranch [8 U. S.] 443; Whelan v. U. S., 7 Cranch [11 U. S.] 112; The Octavia, 1 Wheat. [14 U. S.] 20; The Sarah, 8 Cranch [12 U. S.] 391. The cause of prosecution in the case of La Vengeance occurred at about the same place where the Wave anchored, within the waters of Sandy Hook. Judge Story investigated the subject at an early period in his judicial career, with great sagacity and depth of research, and demonstrated the le-

gitimate jurisdiction of the admiralty over waters within the ebb and flow of the tide. De Lovio v. Boit [supra]. And, after a lapse of fifteen years, that learned judge avowed his adherence, in substance, to the doctrines he had before laid down. The Tilton [Case No. 14,-054]. The circumstance relied upon, that the cause of action in the present case arose within the limits of a state, would, therefore, not exclude the jurisdiction of this court over the subject. The supreme court has decided, that the cession of cases of admiralty and maritime jurisdiction by the constitution is no cession of the waters upon which those cases may arise. The waters themselves remain the territory of the state within which they lie. U. S. v. Bevans, 3 Wheat. [16 U. S.] 3SS. Whatever relation, therefore, this jurisdiction may have to locality, it does not require to support it, that the sovereignty over the place should be in the United States, or out of a particular state. It is, in this respect, of the same character as the jurisdiction conferred upon the federal judiciary, over "all cases affecting ambassadors, other public-ministers and consuls," which must be exercised without regard to territorial limits or jurisdiction. It seems to me, also, that suits in admiralty by material men come within the same principle. The cause of action in such cases always arises within the territory of a state; yet, the admiralty has unquestionable cognizance of them upon tide waters. The Jerusalem [supra]; The General Smith, 4 Wheat. [17 U. S.] 43S. And even with respect to actions by seamen for wages, between joint owners for the possession and management of vessels, and upon hypothecations, the entire cause of action may have its origin and termination within a state. So far as place is taken into contemplation in determining whether admiralty can have cognizance of causes of civil and maritime jurisdiction, the single consideration seems to be, whether they have relation to transactions on sea or tide waters. The Thomas Jefferson, 10 Wheat. [23 U. S.] 42S.

The second objection to the jurisdiction of the court has reference to the capacity of the parties. It is denied that pilots can maintain suits here for any services they may render. This objection embraces two propositions: (1.) That pilots cannot be salvors; (2.) That a court of admiralty cannot take cognizance of claims by pilots for even the pilotage compensations allowed them by law.

(1) The first branch of this objection must undoubtedly be intended to be limited to situations where the pilot might be required to perform the duties of his office, and not to apply whenever he might chance to navigate the high seas. The libellants, or some of them, were appointed to pilot vessels from New-York to sea, and from sea to New-York, by the way of Sandy Hook. It will, therefore, probably not be denied, that if they had rendered services on board a vessel off Charleston Harbor, or at any place remote from Sandy Hook, they might, not-

4 [From 7 N. Y. Leg. Obs. 97.]

withstanding their commission as pilots, claim as salvors in that behalf. The objection is understood to be, that pilots cannot be salvors in places where they may be bound to act as pilots. No case has been cited in which this specific doctrine is advanced. But it is deduced from the assumption that the libellants, as public officers, were bound, ex officio, to perform the services rendered in this case. I shall hereafter advert more particularly to this position, in considering what duties were imposed on them virtute officii; and, unless the disqualification set up against them is found to result from the character and obligations of their appointment, there would seem to be no foundation for it in law or principle. The principles of the maritime law would certainly apply no more strongly in excluding pilots from becoming salvors, than it would to the ship's company of the vessel saved, it being their duty to render all practicable aid to the vessel to which they belong. And yet, at this day, it is incontrovertibly settled, that seamen may be rewarded as salvors, for services in the preservation of their own ship. Mason v. The Blaireau, 2 Cranch [6 U. S.] 269; The Two Catherines [Case No. 14,288]. So, also, the men of a king's ship, whose specific duty it is to protect and succor merchant vessels, are entitled to recover salvage for extraordinary exertions in saving a vessel or cargo. The Mary Ann, 1 Hagg. Adm. 158.

Not only has the counsel for the claimant failed to produce any direct authority in support of the doctrine for which he contends, but it does not appear that the objection has ever been raised in the English court of admiralty; or, if it has been, the principles upon which that court proceeded have completely discountenanced and overruled it. Godolphin, 45–50, 166, 183; Zouch, 50. In the case of The Joseph Harvey, 1 C. Rob. Adm. 306, before Sir William Scott, in April, 1799, the judge observes: "It is allowed the court may, in cases of pilotage, as well as of salvage, direct a proper remuneration to be made. It may be, in an extraordinary case, difficult to distinguish a case of pilotage from a case of salvage, properly so called; for it is possible that the safe conduct of a ship into a port, under circumstances of extreme danger and personal exertion, may exalt a pilotage service into something of a salvage service." In that case, pilots claimed salvage. They boarded a vessel off Dover Castle, which had a signal up for a pilot, and wished to go into the Downs. When spoken, the answer was, that the vessel wanted a pilot; and, there being strong proof of malconduct on the part of the pilot, and the testimony given by him, as to the distress of the vessel, being contradicted, the court refused him any compensation. The question, however, was directly before the court, whether salvage could be claimed by a pilot under such circumstances, and no doubt seems to have been entertained that it could be. Another case is cited by the reporter, in which, there being no misconduct of the pilots, a liberal salvage was awarded by the court. It was the case of a salvage service on the coast by a pilot-boat which went out to the assistance of a vessel in distress. The court awarded salvage, with strong language in support of the claim. "It is expedient," the judge remarks, "for the security of navigation, that persons of this description, ready on the water, and fearless of danger, should be encouraged to go out for the assistance of vessels in distress." The Sarah, 1 C. Rob. Adm. 312, note.

So, also, the courts in this country have recognised the same doctrine. In the case of Dulany v. The Peragio [Case No. 4,123], in the district court of South Carolina, the libellant claimed salvage. He was a pilot, and boarded the vessel while she was at anchor at Bull's Inlet. She had been injured in a storm, and had lost her masts, &c., but the crew had rigged a jury-mast, and the vessel was tight and sufficiently provisioned. The libellant towed her into Charleston Harbor. Judge Bee decided that it was not a case for salvage, but that the pilot should be allowed $200 above his pilotage, and the costs of suit. No doubt was suggested of the authority of the court to give salvage to a pilot. The case of Hand v. The Elvira [Id. 6,015], decided by Judge Hopkinson in the Pennsylvania district, in April, 1829, upon facts extremely like those in the case last cited, except that the vessel was not found at anchor, was also a claim for salvage by pilots. The libellants, when they boarded the vessel, were cruising in their vocation on board their pilot-boat; and the question was raised and discussed by counsel, whether the pilots could be salvors in the case. The judge declared that he had no difficulty upon this point, and adopted the sentiment of Sir William Scott—that circumstances may occur exalting a pilotage into a salvage service—and allowed salvage in the cause. The district court of South Carolina takes cognizance of claims by pilots for salvage. Salvage has been recently allowed by that court for piloting a vessel out of Charleston Harbor, without any question as to the jurisdiction of the court. The Washington v. The Saluda [Case No. 17,232], April, 1831. I am, therefore, satisfied that, by the maritime law, pilots may be remunerated as salvors, even in cases where they may be, at the same time, acting in the capacity of pilots. Whether the statute has prescribed a different rule with respect to the pilots of this port, will be more particularly considered hereafter.

(2) If this court can justly entertain jurisdiction of this cause, it would be authorized, upon the pleadings before it, if the service is proved to be only a pilotage service, to award the libellants a compensation as pi-

lots, should it decide that they could re-cover nothing more. The general objection, therefore, raises the question, whether pilots can sue for and recover pilotage fees in a court of admiralty.

Inquiries into the legitimate jurisdiction of courts of admiralty are amongst the most perplexed questions of our jurisprudence. No standard is established by which this questio vexata can be determined with exactness. By the constitution, the power of the federal judiciary extends to all cases of admiralty and maritime jurisdiction; and, by the act of congress of September 24th, 1789 (1 Stat. 73, 77), the district courts have exclusive original jurisdiction of all civil causes of admiralty and maritime jurisdiction. But neither the constitution nor the statute defines what that jurisdiction comprehends, nor do they indicate the sources from which principles may be drawn limiting or explaining it. A subsequent act, passed May 8th, 1792 (1 Stat. 275, 276), provides, that the forms and modes of proceeding in suits of admiralty and maritime jurisdiction shall be according to the principles, rules and usages which belong to courts of admiralty as contra-distinguished from courts of common law. This act has been construed not to have reference to all courts of admiralty, but to those of England and this country alone (Manro v. Almeida, 10 Wheat. [23 U. S.] 490); and, although the same case interprets the act to have relation to the practice of the court only, and not to its jurisdiction, yet a strong implication would arise that congress contemplated that a court of admiralty in this country derived the principles regulating its jurisdiction, and those which were to govern its practice, from one and the same source. If it be admitted, however, that we are to regard the jurisdiction of the admiralty in England as that which is to determine the character and extent of the jurisdiction of our courts, yet a great difficulty still remains, to ascertain what period in the history of that jurisdiction we are to select, and whether we are to model our judicature, in this behalf, in conformity to the ancient functions of the English admiralty, or limit it to the powers which that court exercised at the Revolution. [Two very recent decisions in the United States supreme court have settled the admiralty jurisdiction of the United States courts. It is substantially as laid down in this case. [License Cases] 5 How. (46 U. S.) 541; [New Jersey Steam Nav. Co. v. Merchants' Bank of Boston]; 6 How. (47 U. S.) 344.] [5] Nor can the authority which that court exercised at any given period of its existence be now defined with certainty. The evidences of its jurisdiction are far from being clear or satisfactory. By the civilians, an almost unlimited extent was claimed for it, whilst the common law lawyers generally considered its legitimate authority as very restricted and unimportant. The history of the foundation of the court is no longer extant.

[5] [From 7 N. Y. Leg. Obs. 97.]

The reasons and purposes which led to its establishment are to be implied only from the objects the court was found to subserve. The theory of British polity supposes the monarch to be the fountain of all judicial authority. In the earlier ages of the government, and, indeed, after the constitution had attained to some degree of symmetry, the judicial power was either exercised in person by the king, or was conferred by him at discretion upon such tribunals as he might designate. The court of the admiral (with those of the marshal and constable) was undoubtedly called into being as an instrument by which the royal prerogative, in relation to matters dehors the kingdom, could be most conveniently exercised. The admiralty court was probably instituted with limitations and restrictions now lost to juridical history. But it would soon be discerned that the court was adapted, by the celerity of its action and its ready subserviency to the will of the monarch, to enlarge and strengthen his powers; and that consideration would lead him, from time to time, to encourage its cognizance of subjects of a purely municipal character. The readiness of the lord high admiral, or of his surrogate, to amplify his jurisdiction, would also conduce to draw under his cognizance matters occurring within the kingdom, whether wholly territorial, or mingling with transactions on the high seas and abroad appertaining appropriately to the tribunal. How long and to what extent this domestic and municipal jurisdiction of the admiralty was exercised, cannot now be ascertained; but there is abundant evidence that it was exceedingly comprehensive and diversified. Zouch, 14, 50; Godolphin, passim. Almost the earliest notice furnished by history of the existence of the court consists in details of the strenuous efforts made to subdue and bound its authority in relation to matters of an internal and municipal character. The acts of 13 and 15 Richard II. were passed for that purpose, the one directing that the admiral shall only meddle with things done upon the sea, and the other, that he shall not take cognizance of contracts, pleas and quarrels, and other things arising within the bodies of counties, nor of wrecks. But, although these statutes designate certain matters with which the admiral shall not meddle, neither of them assumes to define the legitimate objects and limits of his jurisdiction. An active controversy subsisted for ages afterwards between the courts of common law and the admiralty court, upon the claims of jurisdiction. The king was appealed to, as the fountain and arbiter of the powers of all the courts. He commanded a mutual adjustment of the disputed point by the respective judges; but, although the arrangement was solemnly consummated on paper, it was never observed, and the common law courts proceeded, by gradual advances, until they nearly extinguished all procedures in the admiralty. Except as a prize court, it now exercises, in fact, in England, but a meagre and stinted authority, compared with

the powers it once wielded. Yet it is believed that, to this day, the admiralty court does not accede to the justness of the restrictions imposed upon its jurisdiction. The Hercules, 2 Dod. Adm. 371; The Apollo, 1 Hagg. Adm. 312. Let it, therefore, be established, that we are to resort to the English admiralty for the principles and usages which shall govern the proceedings of our own courts of that denomination, and it is manifest that difficulties of serious magnitude lie in the way of any practical and available use of the criterion. It still remains to be settled, to what period or era of the court we shall direct our attention, and how we shall ascertain what authority then properly appertained to the court.

The learning in relation to the history of the English admiralty, its just jurisdiction, the claims of the common law courts in contravention of it, and the principles upon which the admiralty and maritime jurisdiction conferred by the constitution of the United States should be exercised, are collected and systematized in various authorities, a general reference to which will be sufficient to bring into view the doctrines which have prevailed on these topics. Introduction to Hall, Adm. Prac.; Introduction to Serg. Const. Law (2d Ed.); Dup. Jur. Append.; De Lovio v. Boit [Case No. 3,776]; 1 Kent, Comm. 353; U. S. v. Wiltberger. 5 Wheat. [18 U. S.] 106, note; Ramsay v. Allegre, 12 Wheat. [25 U. S.] 614, opinion of Johnson, J., and note; The Tilton [Case No. 14,054]; 6 Dane, Abr. 355; Zouch, 14; Godolphin, c. 4; Exton, Adm. Jur. passim; 4 Inst. 134; 12 Coke, 79; 1 Beawes, Lex. Merc. (by Chitty) 400; Prynne, Animad. 75. The general position which the courts of this country seem disposed to maintain is, that admiralty will take cognizance of subjects of controversy of a maritime character. The Jerusalem [Case No. 7,294].

The piloting a vessel to and from sea would seem to be peculiarly a service of a maritime character. I do not find that the right to recover compensation for such a service, by a suit in admiralty, has ever before been called in question; or that the manner in which the pilot was commissioned, or whether or not the local law supplied him a more convenient remedy has been allowed to affect his right to resort to this court. No doubt seems ever to have been suggested by the court or the bar in England, that pilots might recover their fees in admiralty, except for services on navigable rivers (The Eleanor, 6 C. Rob. Adm. 39; Abb. Shipp., Ed. 1829, pt. 2, c. 5), although such suits are common (The Joseph Harvey, 1 C. Rob. Adm. 306; The Benjamin Franklin, 6 C. Rob. Adm. 350; The Nelson, Id. 227; The Leander, Edw. Adm. 35] [6] ); and notwithstanding a summary remedy, by attachment of the vessel, is furnished them by statute. So, like suits have been sustained in our own courts. The Anne [Case No. 412]; Le Tigre [Id. 8.281]; Trump v. The Thomas [Case No. 14,206]; 1 Wes. R. 568].[6] Judge Story remarks, in the case of The Anne,

---

[6] [From 7 N. Y. Leg. Obs. 97.]

that admiralty has, upon principle, a rightful jurisdiction, as well in personam as in rem, over claims for pilotage for services performed on, from or to the sea; and he expresses his extreme doubt of the correctness of the decisions of the English common law courts, that no suit lay in admiralty, in favor of a pilot, for services on a navigable river within the body of a county. And it is to be remarked, that neither did the statute of Massachusetts; nor does the existing one of this state, prescribe the manner of recovering the compensation of pilots, or furnish any extraordinary facilities in their behalf. It would seem, therefore, to result, that though commissioned under a state law, the pilot may have recourse to any remedy adapted to the nature of his right, and I shall unhesitatingly hold that this action is maintainable in admiralty, whether the libellants claim compensation as salvors, or for pilotage fees. The mode in which the amount of such fees is to be assessed or ascertained, may be determined by the local law, without affecting the remedy in this court. The action of the court in regard to matters clearly within its jurisdiction by the general principles of the maritime code, may be limited to the enforcement of the existing municipal law. The Robert Fulton [Case No. 11,890].

It is not necessary now to inquire whether the state courts have concurrent jurisdiction with the admiralty for the recovery of pilotage fees, inasmuch as no exclusive or specific remedy is prescribed by the state act. Yet, if the case is, in its nature, one of admiralty and maritime jurisdiction, there is great weight of authority for the conclusion, that the jurisdiction of this court is exclusive of that of state tribunals, whether conferred upon them by the laws of the state or by acts of congress. Martin v. Hunter's Lessee, 1 Wheat. [14 U. S.] 337; American Ins. Co. v. Canter, 1 Pet. [26 U. S.] 511, 546; 1 Kent. Comm. 377; Serg. Const. Law, c. 21; Cohens v. Virginia, 6 Wheat. [19 U. S.] 397; Houston v. Moore, 5 Wheat. [18 U. S.] 27, opinions of Johnson and Story, JJ.; Dup. Jur. 90; Rawle, Const. 191. In American Ins. Co. v. Canter, 1 Pet. [26 U. S.] 511, 546, which was a case of somewhat kindred features to the present one, Chief Justice Marshall says, that "admiralty jurisdiction can be exercised in the states, in those courts only which are established in pursuance of the third article of the constitution." This would deny to congress the power of authorizing any state tribunal, as such, to take cognizance of cases of admiralty jurisdiction; much more would it militate against the right of any state to exercise such power, of its own authority. Nor does this doctrine infringe upon that laid down in various decisions, particularly with respect to criminal offences, that there may be a capacity in the United States judiciary, by the terms of the constitution, to exercise a jurisdiction which must, nevertheless, lie dormant because congress has not designated the offence, or the manner in which the court shall act upon it (U. S. v. Bevans, 3 Wheat.,

[16 U. S.] 336; U. S. v. Wiltberger, 5 Wheat. [18 U. S.] 76), because the aid of an authorization by congress is not deemed necessary to perfect the jurisdiction of the court in civil causes of admiralty and maritime jurisdiction (Jennings v. Carson, 4 Cranch [8 U. S.] 2).

The third and last general objection to this action is, that by the laws of the state of New York, under which the libellants were commissioned, they were bound to render the services performed by them, and can only be compensated therefor conformably to the provisions of the state law. This objection rests upon two propositions—that a public officer is bound to perform all the duties of his office, for the compensation appointed by law for such services, and can claim nothing beyond such stated compensation; and that, the mode in which his compensation is to be ascertained being fixed by law, he can avail himself of no other mode of determining the amount.

The first position is well founded in reason, and is, no doubt, sustained by the general principles of law. It has been applied by an eminent judge in denying salvage in a case where an individual derived extraordinary benefit from the services of a public officer. The officer, being in the execution of the duties of his office, happened to render meritorious service to property in peril, and afterwards libelled it for salvage. Judge Washington decided, that he could not sustain the claim. Le Tigre [supra]. The language of the court would, however, seem to imply that if the direct object of the officer had been to preserve the property, he might have been entitled to salvage for such special service, notwithstanding his official authority over, or connection with, the subject.

In order to apply this rule of law to the case before the court, it is necessary to ascertain with precision the nature and extent of the duties imposed upon the libellants by their offices of pilots, and how far they are to be regarded as acting, in this behalf, as public officers. Pilots, in maritime law, are persons taken on board at a particular place, for the purpose of conducting a ship through a river, road or channel, or from or into port. Abb. Shipp. (Ed. 1829), 148; Jac. Sea Laws, 125, 127. In this capacity, they have the entire command of the vessel in her navigation whilst she is under weigh, and in selecting the place and determining the manner of bringing her to anchor. But the pilot is subordinate to the master in all other respects. The latter has the control of the vessel and crew, and is to be obeyed as to the designation and disposal of her, and the time of making sail and coming to. Abb. Shipp. (Ed. 1829) 226. The authority of the pilot being limited, then, by the law maritime, to the navigation of the vessel, his duties and responsibilities as pilot would, accordingly, be bounded by the same limitations. If any further duty was imposed upon the libellants in the present case, it must have been by some provision of positive law. This will lead us into an inquiry as to the situation in which this subject has been placed by statute.

From the year 1731, a statute has been in force in this state in relation to the pilots of this port. The colonial law was re-enacted by the state legislature, after its independency, and has continued, in substance, the same to the present day. Slight variations have occasionally been introduced as the acts passed under review, but nothing essentially changing the general features of the system. 1 Liv. & Smith's Laws N. Y. 200; 5 Geo. II. c. 565; 2 Van Schaack's Laws N. Y. 433; 4 Geo. III. cc. 1, 214; 1 Jones & Varick's Laws N. Y. 120; 6 Webster & Skinner's Laws N. Y. 277. So, also, the other maritime states had, previous to the federal constitution, adopted provisions regulating pilots within their respective territorial jurisdictions. The main purport of the various acts was to provide for the appointment of competent pilots, to declare the manner in which their services should be performed, and to fix their compensation, and, in some instances, the mode of its recovery. To obviate all questions as to the effect of the state laws after the United States government went into operation, congress, at its first session, passed the act of August 7th, 1789 (1 Stat. 53, 54), by which it was enacted, "that all pilots in the bays, inlets, rivers, harbors and ports of the United States, shall continue to be regulated in conformity with the existing laws of the states respectively wherein such pilots may be, or with such laws as the states may respectively hereafter enact for the purpose, until further legislative provision shall be made by congress." The power of congress to adopt, in this manner, the prospective legislation of the states, need not be questioned in the present case, because, the state statutes then and now in force being essentially the same, it is unimportant which is regarded as the rule of decision. The state act of February 19, 1819 (Sess. Laws 1819, p. 11), would, according to the terms of the act of congress, be the one now in force. At all events, it is the one set up by the claimants as prescribing the duties pilots are to perform virtute officii, and as debarring these libellants from all other recompense than that given by the statute. The general duties of this class of pilots, so far as they are defined by that statute, are, to pilot vessels from New-York to sea, and from sea to New-York, by the way of Sandy Hook; to keep and maintain in the piloting service to and from the port of New-York by the way of Sandy Hook, not less than five good and sufficient pilot-boats; and to exhibit their printed instructions to masters of vessels when they board them, and govern themselves by those instructions. The 9th section of the act empowers the board of wardens to adopt such rules as it may deem proper for the government of pilots, and to revoke or amend them at discretion.

A body of rules, adopted by the wardens on the 16th of April. 1819, was offered in evidence; but, as they were revoked by subsequent rules adopted on the 19th of June, 1819, they cannot be regarded as applicable to this case, further than as they may aid in the interpretation of those now in force. The fourth rule of June, 1819, provides. that "vessels that approach the coast in distress shall have the preference of others, and pilots are required to go on board such a vessel appearing in distress and in want of a pilot, in the first instance, and render her every service or assistance in their power." The 19th section of the statute enacts, "that the master, owner or consignee of any ship or vessel appearing in distress and in want of a pilot on the coast, shall pay unto such branch pilot, or deputy pilot, who shall have exerted himself for the preservation of such ship or vessel, such sum for extra services as the said master, owner or consignee and pilot can agree upon; and, in case no such agreement can be made, the board of wardens shall determine what is a reasonable reward, and the sum so determined by them shall be paid in manner aforesaid." It would seem very manifest that the legislature, in the provisions of the above section, and the wardens. in the rule promulgated by them, contemplated no other than mere pilot services. The expressions are aptly selected to convey that meaning; and there is nothing in the language used, or in the subject matter, from which an intention may be inferred to embrace other cases than those in which the professional assistance of the pilot is wanted. Had the legislature intended to constitute the pilots wreckers also, a very different form of expression would have been proper and necessary. The pilots are required to go on board of vessels in distress and wanting a pilot. If the vessels are in predicaments where a pilot, as such, can be of no service to them. the case has not occurred which is pointed out by the rule or by the statute, in which the pilot is compelled, ex officio. to go to their aid, whatever may be their distress. It appears to me, that no other construction can be given to the rule or to the statute, consistently with the plain import of their language and with the purpose they were designed to answer. than to limit their operation to cases where the skill and experience of the pilot are required in the immediate duties of his office. A vessel on shore, or wrecked, or so disabled as not to be navigable, would stand in no need of the officers created by this law, or of the peculiar skill which they are appointed to exercise. Any able-bodied mariner would be as serviceable to her as a pilot. So. in the present case, if the Wave had sailed with a pilot on board, and had met this disaster, she would have needed the relief which the libellants afforded her, no less on account of having such pilot; and yet no one will contend, that when a vessel is already provided with a competent pilot, the law makes it the duty of any other pilot to go on board of her. Besides, the pilot is not required, by law, to take with him his boat's crew, or any person, to assist in manning or navigating a vessel in distress; nor is he bound to employ his boat in her aid, further than to put him on board. We are not discussing the obligations of humanity, but the extent and character of the duties which are enjoined upon pilots by virtue of their offices. The statute requires the boats to be kept in the piloting service. That service manifestly is, to cruise between points where pilots are put on board and taken off from vessels, prepared to furnish pilots to vessels coming in, and to take them from those going to sea. It would be foreign from that service to lade the boats with wrecked goods, or send them into port with the cargoes of vessels requiring to be lightened; and the special duty to which pilots are appointed, and for the performance of which they are to supply boats, must be abandoned, to enable them to engage in that of wreckers. If the true construction of the law and of the regulations obliges a pilot-boat's whole company, together with the boat, to be devoted to the relief of a vessel situated as the Wave was, then this duty. must be discharged, although, at the same time, other vessels should appear off the coast wanting pilots, and such vessels must be left to the peril of their situation, whatever may be the consequences. This is not the view I take of the law. In my judgment, no pilot service was performed in this case; and, if the libellants had neglected vessels coming in and wanting them, to undertake the saving of the Wave and her cargo, they would have forfeited their commissions, and probably been personally subjected to damages. I think that the law and the regulations, so far from enjoining on pilots this species of service, are so framed as to be clear of doubt that nothing beyond the skill and exertions of the individual pilot put on board a vessel, are provided for or contemplated. When not neglecting the specific duties of his office, a pilot may engage in a salvage service, and he stands, in respect to it, upon the same footing as other mariners.

There are other considerations which conduce to prove that the present case is not embraced within the purview of the state law. It is extremely doubtful whether the libellants. if they had done nothing on board this vessel but as pilots, could charge or receive pilotage for bringing her back to New-York. The second proviso to the 22d section of the state statute is, "that no pilotage whatever shall be demanded or received by any such pilot, for any such ship or vessel coming into the said port of New-York, unless such pilot shall take charge of such ship or vessel to the southward of the upper middle ground. and such vessel be at least of the burthen of seventy tons, unless such vessel shall make the usual signal for a pilot." &c. Now, although the court should judicially

take notice of the topography of New-York bay, and decide that this vessel was to the southward of the upper middle ground, yet she was making no signal for a pilot, nor was she coming into this port, nor is there any evidence that she was of seventy tons burthen.

If this is, upon the facts, not a case in which pilotage fees could be demanded, then, most manifestly, the extra compensation provided for by the 19th section of the state statute would not apply to it, for that is given only where the pilot has exerted himself for the preservation of a vessel wanting a pilot. Whatever may have been the magnitude or value of the services, they would not come within the description of those which the board of wardens is authorized to reward. It will, accordingly, be unnecessary to inquire how far it is competent for a tribunal erected by a state law, to exercise a portion of the admiralty and maritime jurisdiction conferred by the constitution on the judiciary of the United States, or what effect or influence the existence of the board of wardens would have, in ousting the jurisdiction of this court in the recovery of pilot fees, inasmuch as this case is not shown to be one which the state· law has given that tribunal authority to dispose of. And, although I entertain no doubt of the authority of this court to afford pilots a remedy for fees, yet in the present posture of this cause, there would be great difficulty in bringing the acts of the libellants within the statute providing fees for pilot service, or within the general principles of maritime law in regard to pilotage.

It is, also, exceedingly doubtful whether any interpretation can be given to the state act, consistently with its general scope and various expressions, which does not limit the extra compensation to be awarded by the wardens, to services rendered to vessels coming on to the coast from abroad. So the wardens understood it, for their instructions apply only to vessels which are out of port and are seeking to enter it.

My opinion upon the whole case is, that this is a case not of pilotage but of salvage service, and that the libellants are entitled to recover salvage for the services rendered the vessel and her cargo, although infra fauces terrae. or on waters within the territorial limits of New-York or New-Jersey. The conduct of the parties on both sides shows, that they did not consider that Hyer and his crew were rendering a pilotage service only.

The only remaining inquiry is—what amount shall be awarded to the libellants? Various considerations are regarded by the court, in exercising its discretion in fixing a salvage compensation. The most prominent are, the peril to which the property was subjected; the means possessed for its rescue; its value; the degree of labor and hazard which the salvors encountered; the value of their property exposed by the undertaking; and the interests of navigation and humanity concerned in holding out liberal encouragements to induce persons to attempt the relief of vessels and their crews in distress. Enough has been before stated, to show that the Wave, when relieved by the libellants, was in a situation of great peril. It was mid-winter, the bay was full of ice, and a heavy wind was blowing. It was also late in the afternoon of the day. There was no vessel, except that of the libellants, any where in sight, and the crew of the Wave testify, that they were already so exhausted by their labors, that they could not have kept their vessel afloat more than an hour and a half longer. It is, however, suggested in some of the proofs, and was much pressed in argument, that the necessity for the interference of the libellants was not so imminent, as the Wave had anchored at so short a distance from shore, that she might have been easily beached, and her cargo and crew probably saved without loss or serious risk. The argument rests upon mere supposition. The ice made out some distance from the shore, and there is no evidence that it could have been penetrated by the Wave, or that she could have touched ground before reaching it. Nor was she in a condition to make the effort. She was waterlogged, and had lost her steerage, and her crew depose that, when she anchored, they dared not bring her on the wind, for fear she would capsize. These facts show, that if she was not entirely unmanageable, it would have been a very dangerous, if not hopeless attempt, to endeavor to run her on shore. But, furthermore, admitting she could have been run aground, we are not only to regard the existing perils which surrounded her, but, how far her condition would probably have been benefitted by that change, ought also to be taken into consideration. The wind was from the northeast through that night, with a heavy fall of snow. The next day and the day after it blew with great violence, so that the Wave required both anchors to secure her in the anchorage to which the libellants had taken her, and where she had the advantage of land shelter. The opinion of some of the witnesses is, that she could not have stood the gale at all in her unsheltered position, if aground, and must have immediately gone to pieces. In such case, both vessel and cargo must have been totally lost, and very little chance would have existed for saving the lives of the crew. The services of the salvors must, accordingly, be deemed meritorious on their part, and of extreme necessity to all interested in the Wave. They were rendered with great promptitude, skill and diligence, so as not only to save the property, but to secure it against the injury it was then incurring. The cargo saved, after all damages deducted, was appraised at $9,537.86, and the vessel at $1,500. Although the claimant was thus benefitted by these services, no serious personal risk or hazard of property was encountered by the libellants. They loaded the pilot-boat, stopped the leak of the Wave, and got both vessels under weigh in about three hours.

During that time, they labored with great activity and good judgment. Every man was employed to the extent of his ability. Some additional fatigue and delay were also incurred in towing the Wave, and in coming to anchor with her once before reaching Prince's Bay, but those services were not attended with any extra hazard of life or property. The pilot-boat was valued at from $2.500 to $3,000. These circumstances show nothing which exalts the salvage in this case to one meriting a prodigal reward. Courts do not look alone at the benefits received by the owner of the property saved. They regard, also, the character of the service, and the degree of compensation which would, under like circumstances, command similar relief. I shall decree that the libellants receive one-tenth part of the value of the vessel and cargo, as appraised. I might feel supported by authority in giving a larger compensation. Lord Stowell allowed a king's ship, for saving a merchantman, one-tenth of ship, cargo and freight. The Mary Ann, 1 Hagg. Adm. 158. Judge Hopkinson allowed above one-ninth of all saved to pilots, where the services were very trivial, and not of indispensable necessity to the vessel. Hand v. The Elvira, before cited. But the value of the property saved in this instance, makes, in my estimation, the compensation to the libellants, if it is fixed at one-tenth, adequate for the services rendered. The share to be allotted to the apprentices is not to be paid to their master, but to them individually. Mason v. The Blaireau, 2 Cranch [6 U. S.] 239, 270. Decree accordingly, with taxed costs to the libellants, and $50 for counsel fees.

NOTE. This case was taken, by appeal, to the circuit court, where the decision of this court was reversed. It is understood that that court held that the danger in which a vessel may be, does not lessen the duty of a pilot to devote himself, as such, to her rescue; that when a vessel is in distress, and is found in that situation by pilots on their cruising ground, it is their duty, as pilots, to bring her into port; that if their services have been extraordinary, they are entitled to extra pilotage therefor, to be determined according to the laws of the state of which the port out of which they cruise is a part; and that the laws of the states in relation to pilots are adopted by congress, and supply the rule of reward to those officers. It was admitted that pilotage was of admiralty jurisdiction, and that pilots might be salvors when they went beyond the duties imposed upon them by the statute under which they acted. [Case No. 17,300.] The points involved in this case have since been before the supreme court of the United States, in the case of Hobart v. Drogan, 10 Pet. [35 U. S.] 108, and the opinion of the district court, as here presented, is believed to be in harmony with the law as now understood.

NOTE [from 7 N. Y. Leg. Obs. 97]. The following decisions, respecting the admiralty jurisdiction of the United States courts, and the rights of pilots as salvors, have been made since the delivery of the above opinion: Waring v. Clark, 5 How. [46 U. S.] 451. 6 How. [47 U. S.] 344; Hobart v. Drogan, 10 Pet. [35 U. S.] 108; The General Palmer, 2 Hagg. Adm. 177, 178; The Funchal, 3 Hagg. Adm. 386, note; The Elizabeth, 8 Jur. 365; The Frederick, 1 W. Rob. Adm. 17; The Hebe, 2 W. Rob. Adm. 246; The Cumberland, 9 Jur. 191; The Dosseitei, 10 Jur. 866; New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. [47 U. S.] 378.